**TO: Clerk's Office**
   **UNITED STATES DISTRICT COURT**
   **EASTERN DISTRICT OF NEW YORK**

_____

   **APPLICATION FOR LEAVE**
   **TO FILE DOCUMENT UNDER SEAL**

**********************************
United States of America

               -v.-                    21-MJ-1102
                                    _____
Eric Goldstein, Blaine Iler, Michael Turley and    Docket Number
Brian Twomey
**********************************

SUBMITTED BY: Plaintiff____ Defendant____ DOJ ✔
Name:  Robert Polemeni_____
Firm Name:USAO_____
Address:_____
       _____
Phone Number:  718 254-6044_____
E-Mail Address:robert.polemeni@usdoj.gov_____

INDICATE UPON THE PUBLIC DOCKET SHEET: YES____ NO ✔
**If yes, state description of document to be entered on docket sheet:**

_____

_____

_____

**MANDATORY CERTIFICATION OF SERVICE:**
**A.)** ___ A copy of this application either has been or will be promptly served upon all parties to this action, **B.)** ___ Service is excused by 31 U.S.C. 3730(b), or by the following other statute or regulation:_____; or **C.)** ✔ This is a criminal document submitted, and flight public safety, or security are significant concerns. (Check one)

        September 27, 2021_____          _Robert Polemeni_____
              DATE                              SIGNATURE

---

**A) If pursuant to a prior Court Order**:
Docket Number of Case in Which Entered:_____
Judge/Magistrate Judge:_____
Date Entered:_____

**B) If a new application,** the statute, regulation, or other legal basis that authorizes filing under seal

_____

_____

**ORDERED SEALED AND PLACED IN THE CLERK'S OFFICE, AND MAY NOT BE UNSEALED UNLESS ORDERED BY THE COURT.**

DATED: Brooklyn_____, NEW YORK

_Lois Bloom_                          9/27/21

**U.S. MAGISTRATE JUDGE**

RECEIVED IN CLERK'S OFFICE_____
                                      DATE

SPN:RTP/LZ
F. #2018R01916

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

      - against -

ERIC GOLDSTEIN,
BLAINE ILER,
MICHAEL TURLEY and
BRIAN TWOMEY,

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

**COMPLAINT AND AFFIDAVIT IN SUPPORT OF ARREST WARRANTS**

Cr. No. <u>21-MJ-1102</u>
(T. 18, U.S.C., §§ 371, 666(a)(1)(B),
 666(a)(2) and 1951(a))

EASTERN DISTRICT OF NEW YORK, SS:

          MAEGAN REES, being duly sworn, deposes and states that she is a Special

Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as

such.

          In or about and between March 2015 and December 2016, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants ERIC GOLDSTEIN, BLAINE ILER, MICHAEL TURLEY and BRIAN TWOMEY,

together with others, knowingly and intentionally conspired to obstruct, delay and affect

commerce, and the movement of articles and commodities in commerce, by extortion, in that

GOLDSTEIN and others obtained property from ILER, TURLEY, TWOMEY and others with

their consent, which consent was to be induced under color of official right, to wit:

GOLDSTEIN's position as a senior executive of the New York City Department of Education ("NYC DOE").

(Title 18, United States Code, Section 1951(a))

In or about and between March 2015 and December 2016, both dates being and approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants BLAINE ILER, MICHAEL TURLEY and BRIAN TWOMEY, together with others, did knowingly, intentionally and corruptly give, offer and agree to give one or more things of value to one or more persons with intent to influence and reward an agent of a government agency, to wit: the defendant ERIC GOLDSTEIN in his official capacity as an agent of the NYC DOE, in connection with business and one or more transactions and series of transactions of such government agency involving a thing of value of $5,000 or more, while such government agency was in receipt of, in any one year period, benefits in excess of $10,000 under one or more Federal programs involving grants, subsidies, loans, guarantees, insurance and other forms of Federal assistance.

(Title 18, United States Code, Sections 666(a)(2))

In or about and between January 2015 and December 2016, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ERIC GOLDSTEIN, being an agent of a government agency, to wit: the NYC DOE, did knowingly, intentionally and corruptly solicit and demand for the benefit of ERIC GOLDSTEIN, and accept and agree to accept, one or more things of value from one or more persons, to wit: the defendants BLAINE ILER, MICHAEL TURLEY and BRIAN TWOMEY, intending to be influenced and rewarded in connection with business and one or more transactions and series of transactions of such government agency involving things of value of $5,000 or more, while such

government agency was in receipt of, in any one year period, benefits in excess of $10,000 under one or more Federal programs involving grants, contracts, subsidies, loans, guarantees, insurance and other forms of Federal assistance.

(Title 18, United States Code, Sections 666(a)(1)(B))

The source of your deponent's information and the grounds for her belief are as follows:

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since September 2017.   I am responsible for conducting and assisting in investigations into the activities of individuals and criminal groups responsible for corruption and public integrity offenses, including, but not limited to, bribery, mail and wire fraud, money laundering and tax evasion.   I am familiar with the facts and circumstances set forth below from my participation in the investigation and my review of the investigative file and from reports prepared by other law enforcement officers involved in the investigation.

2.     This affidavit is intended to show that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

I.     The Defendants and Relevant Entities

3.     The NYC DOE is the largest school system in the United States, with more than one million students taught in more than 1,800 schools and an annual budget of more than $25 billion.   The NYC DOE receives more than $10,000 per calendar year of federal program funds involving grants and other forms of federal assistance.

4.     The NYC DOE Office of Food and Nutrition Services ("SchoolFood") is responsible for managing the overall food service operation for all NYC schools, which includes,

among other things, procuring and entering into contracts with food manufacturers and distributors.

5.     Between 2008 and September 2018, the defendant ERIC GOLDSTEIN ("GOLDSTEIN") was the NYC DOE's Chief Executive Officer of the Office of School Support Services ("OSSS Chief Executive").   As OSSS Chief Executive, GOLDSTEIN oversaw the management, budget and operations of several NYC DOE departments, including SchoolFood, the Public School Athletic League and the Office of Pupil Transportation ("OPT"). GOLDSTEIN reported directly to the NYC DOE's Deputy Chancellor of Operations. GOLDSTEIN's NYC DOE office was located in Queens, New York.   In or about September 2018, the NYC DOE Chancellor terminated GOLDSTEIN's employment after the NYC DOE received complaints from students and parents alleging repeated poor performance by OPT.

6.     In addition to being OSSS Chief Executive, in or around 2012, GOLDSTEIN founded the Urban School Food Alliance ("USFA"), a consortium of six of the largest school districts in the country.   The purpose of USFA was to leverage the school districts' joint purchasing power to help drive down nationwide food purchasing costs while standardizing specifications for certain foods and food supplies.   GOLDSTEIN served as the Chairman of USFA from its inception until September 2018.

7.     The defendant BLAINE ILER ("ILER") is a businessman and a resident of Dallas, Texas.

8.     The defendant MICHAEL TURLEY ("TURLEY") is a businessman and a resident of Fayetteville, Arkansas.

9.     The defendant BRIAN TWOMEY ("TWOMEY") is a businessman and a resident of Dallas, Texas.

10.     In or about April 2015, the defendants ILER, TURLEY and TWOMEY co-founded a food services company based in Texas, whose identity is known to your affiant ("Food Service Company").   Food Service Company was formed to provide various food products to retail and food service markets, including to K-12 schools across the country.   Food Service Company did not manufacture or process the food products it marketed and sold; instead, Food Service Company partnered with food manufacturers to produce the products that Food Service Company had contracted to provide.   Food Service Company promoted and sold a number of products, including antibiotic-free chicken products marketed under the brand name Chickentopia, yogurt products marketed under the brand name Merrywood Farms and beef products marketed under the brand name Range Meats.

11.     At or around the same time that Food Service Company was founded, the defendants GOLDSTEIN, ILER, TURLEY and TWOMEY (collectively, the "Defendants"), as well as a fifth individual ("Partner No. 5"), whose identity is known to your affiant, co-founded Range Meats Supply Company, LLC ("RMSCO").   RMSCO purchased grass-fed beef from international suppliers that Food Service Company, in turn, promoted and sold under the brand name Range Meats to retail markets, including schools.   Food Service Company, which was owned by ILER, TURLEY and TWOMEY, owned 60% of RMSCO; GOLDSTEIN owned 20% of RMSCO; and Partner No. 5 owned the remaining 20% of RMSCO.   GOLDSTEIN was an owner of and partner in RMSCO while he was NYC DOE OSSS Chief.   As detailed further below, in or about November 2016, ILER, TURLEY and TWOMEY transferred Food Service Company's 60% interest in RMSCO to GOLDSTEIN.

II.    Probable Cause

    A.    Overview

        12.    Shortly after ILER, TURLEY and TWOMEY began partnering with GOLDSTEIN in RMSCO, they began meeting with SchoolFood senior officials and employees, all of whom reported to GOLDSTEIN in his role as OSSS Chief Executive, to promote Food Service Company's products.   For example, in or about June 2015, ILER, TURLEY and TWOMEY began meeting with SchoolFood employees to promote Food Service Company's Merrywood Farms yogurt parfait brand and Chickentopia products, including antibiotic-free chicken drumsticks and antibiotic-free chicken tenders.   Beginning in March 2016, they began meeting with SchoolFood senior officials and employees to promote Food Service Company's Range Meats brand grass-fed beef burger.

        13.    ILER, TURLEY and TWOMEY were successful in obtaining SchoolFood's approval to serve Food Service Company's products in New York City schools. Beginning in December 2015, SchoolFood began serving Food Service Company's Merrywood Farms yogurt parfait and Chickentopia antibiotic-free chicken drumsticks in all New York City public schools.   In September 2016, SchoolFood began serving Chickentopia antibiotic-free chicken tenders.   In or about June 2016, SchoolFood selected Food Service Company's Range Meats grass-fed beef burger as one of two burger brands to be served in schools.   Food Service Company's products were served in schools until in or about April 2017 when, following repeated allegations made by students and staff of foreign objects being found in products, including one incident in October 2016 when a NYC DOE employee choked on a bone in a Chickentopia chicken tender, SchoolFood stopped serving all Food Service Company products.

14.      Based on my training, experience and knowledge of the investigation, and as discussed further below, I believe that GOLDSTEIN used his official position and his considerable influence within SchoolFood to aid ILER, TURLEY and TWOMEY in Food Service Company's business dealings before SchoolFood.   Among other conduct, ILER, TURLEY and TWOMEY regularly reached out to GOLDSTEIN outside official NYC DOE channels to ask him to exert his influence with SchoolFood staff.   GOLDSTEIN responded to such requests in a variety of ways, including by taking official acts and exerting pressure on SchoolFood staff to take official acts that benefited Food Service Company.   GOLDSTEIN, ILER, TURLEY and TWOMEY also concealed GOLDSTEIN's partnership interest in Range Meats and RMSCO from SchoolFood employees, including other senior SchoolFood officials. In exchange for GOLDSTEIN's assistance, ILER, TURLEY and TWOMEY compensated GOLDSTEIN by, among other things, transferring tens of thousands of dollars from a Food Service Company bank account to RMSCO bank accounts for GOLDSTEIN's benefit.

B.      GOLDSTEIN and Food Service Company Early Communications

15.      On or about December 9, 2014, GOLDSTEIN, in his official role as USFA's Chairman, publicly announced USFA's intention to move towards serving antibiotic-free chicken ("ABF chicken") in USFA member school districts.   GOLDSTEIN noted that "chicken was chosen because it is one of the most popular items served in school cafeterias."

16.      Shortly thereafter, in or about February and March 2015, GOLDSTEIN, in his official role as OSSS Chief Executive, publicly announced that SchoolFood, consistent with USFA's initiative, would begin serving ABF chicken products in New York City schools beginning as early as the spring of 2016.   At the time of the announcement, SchoolFood purchased nearly 15 million pounds of chicken per year at a cost of approximately $28 million

dollars per year.   In addition to leading the initiative for antibiotic-free chicken, GOLDSTEIN

advocated for SchoolFood to begin serving food products made in New York as part of a "made

in New York" campaign and for the introduction of healthier beef products, including grass-fed

beef, in schools.

17.     At approximately the same time, in or about March and April 2015, ILER,

TURLEY, TWOMEY and GOLDSTEIN began to discuss the formation of RMSCO, including

via email communications between April 23, 2015 and April 29, 2015.   In one such email,

GOLDSTEIN stated:

> Just to recap the call last night…We will look to develop two
> brands: Range (the grass fed premium brand) and Glatt Kosher
> brand…We also need to plan a trip to Chile and possibly Costa
> Rica.

In another email, GOLDSTEIN stated:

> How are we registering it? We should have a call about how we
> capitalize the company, roles, and responsibilities, and equity
> etc…I suggest Newco LLC that generates the sales into food
> service as its capitalization for brand business. All we do know
> [sic] can be fake as loans to Newco that Newco will repay when
> profitable.

18.     I believe these email messages show that GOLDSTEIN, ILER, TURLEY,

TWOMEY and Partner No. 5 were discussing RMSCO's organizational structure and capital

formation and how the partners would account for spending ("We should have a call about how

we capitalize the company, roles, responsibilities, and equity" and "All we do know [sic] can be

fake as loans to Newco and Newco will repay when profitable").

19.     In early May 2015, GOLDSTEIN and TWOMEY traveled to Chile to visit

beef producers.

20.     On May 14, 2015, TWOMEY sent an email to GOLDSTEIN in which he stated, in relevant part:

> Per our discussion yesterday, the attached company agreement and Unanimous Written Consent document need to be signed…On a personal note, I really enjoyed our time together in Chile, and am pleased to have a new partner and friend.

TWOMEY attached three documents to his email message, including one entitled "Company Agreement RANGE Beef."   I believe this email and its attachments demonstrate that the Defendants took additional steps to document their partnership in RMSCO ("the attached company agreement and Unanimous Written Consent document need to be signed asap") following TWOMEY and GOLDSTEIN's May 2015 trip to Chile to visit beef producers.

21.     In furtherance of the RMSCO business, GOLDSTEIN, ILER, TURLEY and TWOMEY created rangemeats.com email accounts, a RMSCO website (www.rangemeats.com) and business cards, like the one reproduced here:



The Defendants also opened a RMSCO bank account (the "RMSCO Bank Account") on which they were all signatories.

      C.    Goldstein Helps Food Service Company Secure and Maintain NYC DOE Business

      22.    Approximately two weeks after the Chile trip, on or about May 26, 2015, a SchoolFood executive ("SchoolFood Executive 1")[1] sent an email from his/her personal email account to TURLEY.   The body of the email did not contain any text.   Attached to the email was an Excel spreadsheet entitled "chicken."   TURLEY forwarded the email and spreadsheet to ILER and TWOMEY and wrote, "Boom motherfucker!"   I have reviewed the Excel spreadsheet and believe that it contains historical data regarding the quantity of various chicken products ordered by SchoolFood and the money spent on those products.   I further believe that SchoolFood Executive 1 used his/her personal e-mail address instead of his/her official NYC DOE email account to conceal the fact that SchoolFood Executive 1 had provided internal SchoolFood data to a company that was pursuing business with SchoolFood.

      23.    On or about Tuesday, June 16, 2015, ILER, TURLEY and TWOMEY met with SchoolFood staff, including SchoolFood Executive 1 and a second SchoolFood executive ("SchoolFood Executive 2"),[2] to promote Food Service Company's Merrywood Farms yogurt parfait.   The day before, Monday, June 15, 2015, ILER, TURLEY and TWOMEY had met with GOLDSTEIN at a New York City hotel to, among other things, draft a partnership agreement for

---

[1] SchoolFood Executive 1 was Deputy Executive Director of SchoolFood.

[2] SchoolFood Executive 2 was the Executive Director of SchoolFood and reported directly to GOLDSTEIN.

RMSCO.   Prior to these meetings, ILER, TURLY and TWOMEY exchanged communications, stating as follows, in relevant part:

> TURLEY: FYI I am going to fabricate a little bit for the protection of Eric . . . I am going to tell [SchoolFood Executive 1] and [SchoolFood Executive 2] that we a meeting with investors and a supplier Monday.   And a Tuesday meeting is 1 – Needed for travel/cost efficiency, 2 – Our only available dates for a couple of weeks.
>
> I guess that none of it is really a fabrication now that I consider it ... [Partner No. 5] and Eric ARE investors [in a different business][3].
>
> ILER: I have no problems with that whatsoever.   Sounds good.
>
> TWOMEY: Eric is going to be pumped about ABF/non-GMO chicken.

Based on my knowledge of the investigation, I believe that in this exchange, ILER, TURLEY and TWOMEY agreed not to disclose to SchoolFood Executives 1 and 2 that they (ILER, TURLEY and TWOMEY) were business partners with GOLDSTEIN in RMSCO in order to conceal GOLDSTEIN's conflict of interest ("FYI I am going to fabricate a little bit for the protection of Eric . . .   I am going to tell [SchoolFood Executive 1] and [SchoolFood Executive 2] that we a meeting with investors and a supplier Monday").   I further believe that ILER, TURLEY, TWOMEY and GOLDSTEIN scheduled their June 15, 2015 meeting at a hotel to avoid revealing that GOLDSTEIN had a business relationship with a company that was pursuing business with SchoolFood.   I also believe that the exchange shows that ILER, TURLEY and TWOMEY were aware that GOLDSTEIN was interested in serving ABF chicken in schools ("Eric is going to be pumped about ABF/non-GMO chicken").

---

[3] As in original.

24.     On or about June 23, 2015, ILER, TURLEY and TWOMEY exchanged communications in which they stated, in relevant part:

| | |
|---|---|
| TURLEY: | FYI – Got Roger Rabbit that spot in NYC marathon.   Official. |
| ILER: | That is awesome |
| TWOMEY: | Boom! |

Based on my knowledge of the investigation, I am aware that ILER, TURLEY and TWOMEY often referred to GOLDSTEIN as "Roger Rabbit" or "Roger."   I believe that, here, TURLEY was confirming that he had secured a spot for GOLDSTEIN in the New York City Marathon.

25.     On or about June 24, 2015, ILER, TURLEY and TWOMEY exchanged communications, stating as follows, in relevant part:

| | |
|---|---|
| TURLEY: | Talked to Roger.   He's going to bust balls tomorrow. |
| ILER: | Yessss |
| TWOMEY: | Great! |
| ILER: | Parfait and chicken? |
| TURLEY: | Parfait.   I haven't spoken to [SchoolFood Executive 3][4] about chicken so I didn't bitch about that. I used the official angle of 'you asked a vendor to do something.   We overdelivered.   And to boot we gave you a solution that is "Made in NY".   This needs to be slated for Fall menu.   And we're being slow played with maybe in Jan.' His first response was '[SchoolFood Executive 2] needs to nut up and tell [SchoolFood Executive 3] what to do.' |
| TWOMEY: | Awesome |
| ILER: | Haha love it!   True New Yorker.   No bullshit. Shoots straight. |

---

[4]  SchoolFood Executive 3 was Director of Food and Menu Management.

I believe that these communications demonstrate that TURLEY had told GOLDSTEIN ("Roger") that he (TURLEY) was frustrated because, although Food Service Company had "overdelivered" for GOLDSTEIN ("I used the official angle of 'you asked a vendor to do something.   We overdelivered'"), SchoolFood employees had told TURLEY that SchoolFood was planning to serve the parfait in schools beginning in January 2016 and not in fall 2015, as TURLEY had hoped ("This needs to be slated for Fall menu.   And we're being slow played with maybe in Jan.'").   In response to TURLEY's concerns, GOLDSTEIN told TURLEY that he (GOLDSTEIN) would intervene and instruct SchoolFood Executive 2 to direct SchoolFood Executive 3 to have SchoolFood began serving the yogurt parfait on the timeline dictated by TURLEY ("He's going to bust balls tomorrow. . . . His first response was 'SchoolFood Executive 2 needs to nut up and tell SchoolFood Executive 3 what to do'").

26.     On July 9, 2015, ILER, TURLEY and TWOMEY communicated via text message, stating, in relevant part:

> TURLEY:      Call with eric at 3:30 correct. Call in to conf line or are you calling us?
>
> TWOMEY:      Conf line. 3:30 central
>
> TWOMEY:      You think it's appropriate to email Eric the chickentopia/drumstix flyer to get his thoughts?
>
> TURLEY:      I think its fine under the premise that we would like to get in front of the Alliance group and present our solution. We know the NYC deal is bound by a pending Rfp but some might be ready/able to act for this year.

I believe this text message exchange demonstrates that ILER, TURLEY and TWOMEY strategized on how best to leverage GOLDSTEIN's influence to push Food Service Company's Chickentopia products in New York City as well as other USFA member school districts (the

"Alliance").   Later that day, on July 9, 2015, TWOMEY sent an email with the subject "ABF

Chicken" to one of GOLDSTEIN's personal e-mail accounts, stating, in relevant part: "want to

chat about the attached, and get your feedback for potentially getting in front of some of the

alliance members."

27.     The next morning, July 10, 2015, TURLEY sent an email to

GOLDSTEIN's USFA email account, stating, in relevant part: "Based on our rough math, we

have enough drumsticks (2 MMA) to supply all Alliance members one menu day per month."

28.     That same morning, July 10, 2015, a SchoolFood employee emailed

SchoolFood staff, including SchoolFood Executives 2 and 3, stating, in relevant part: "Eric

received a call from Mike Turley at [Food Service Company] and he asked me to call him back

and make sure he has all of the info needed on chicken procurement."

29.     A few minutes later, also on July 10, 2015, TURLEY sent an email to

ILER and TWOMEY, stating, in relevant part:

> 1. Eric delivered FIRST THING this morning.
> 2. This outreach is still open/on going, despite the July 8 due date.
> 3. This is NOT a new RFP.
> 4. Highlights that there is another "list" for communicating
> opportunities. This is an offline email distribution list. We are now
> on it.
> 5. This is only to get a product or products on their approved list so
> they CAN buy if they want. But it's how we get our stuff available
> to be substituted for big T (or anyone else who drops the ball)

I believe the text and email messages in the preceding paragraphs show that after multiple

telephonic and email communications between the Defendants, GOLDSTEIN, in his capacity as

OSSS Chief Executive, took official action to benefit Food Service Company in its business

dealings before SchoolFood, including instructing a subordinate to assist TURLEY in submitting

Food Service Company's Chickentopia chicken products for distribution to NYC Schools.

("Eric delivered FIRST THING this morning… This outreach is still open/on going, despite the July 8 due date… This is NOT a new RFP").

       30.     On or about July 22, 2015, ILER traveled to New York City to meet with SchoolFood senior officials to promote Food Service Company's yogurt and ABF chicken products.   During his trip, ILER also met privately with GOLDSTEIN outside of NYC DOE's offices, including visiting a local manufacturer whom they hoped would partner with RMSCO. In emails and text messages over the following days, ILER provided updates to TURLEY and TWOMEY about ILER's discussions with SchoolFood employees and GOLDSTEIN, including the following exchange:

| | |
|---|---|
| TURLEY: | Gotta do Chile, huh?   Good thing I sent that email. Haha |
| ILER: | I didn't realize the importance till I got in the car with Eric. |
| TURLEY: | Can't blame a guy for that. |
| TWOMEY: | Is Eric with you Blaine? |
| ILER: | No |
| ILER: | Talked to Eric again. Going to take me to see [SchoolFood employee] tomorrow (boom). |

I believe that, here, ILER, TURLEY and TWOMEY were discussing a recent trip to Chile to further the RMSCO business; the exchange demonstrates that ILER and TURLEY believed that this trip was important to GOLDSTEIN.   I also believe that GOLDSTEIN, in his official capacity as OSSS Chief Executive, had arranged for ILER to meet with a SchoolFood employee while ILER was in NYC ("Talked to Eric again. Going to take me to see [SchoolFood employee] tomorrow (boom)").

31.     The following day, July 23, 2015, ILER, TURLEY and TWOMEY exchanged communications discussing ILER's meeting with a SchoolFood employee, stating, in relevant part:

|  |  |
|---|---|
| ILER: | Highest priority is roasted drumstick.   No glaze. Served every 2-3 weeks.   Most popular.   Only one other competitor and not NE3.   'We need it, like, yesterday' |
| TWOMEY: | Is that [SchoolFood employee]? |
| ILER: | Yes |
| TWOMEY: | You still with her? |
| ILER: | Eric did the power play – came in and pulled me aside for a few minutes. |

I believe that, here, a SchoolFood employee had told ILER that Food Service Company should focus on providing chicken drumsticks to SchoolFood ("Highest priority is roasted drumstick"). ILER also noted that GOLDSTEIN had interrupted the meeting to make clear to the SchoolFood employee that he (GOLDSTEIN) was in charge and that he supported Food Service Company products ("Eric did the power play – came in and pulled me aside for a few minutes").

32.     Later that same day, during the evening of July 23, 2015, ILER sent an email to TURLEY and TWOMEY in which he recapped his trip.   ILER noted that when he met privately with GOLDSTEIN, GOLDSTEIN told him: "I'm going to buy a lot of fucking chicken from you guys, let's do the beef."   I believe that GOLDSTEIN was emphasizing to ILER that GOLDSTEIN would use his official position as OSSS Chief Executive to have SchoolFood purchase Food Service Company's Chickentopia products and, in exchange, GOLDSTEIN expected that ILER, TURLEY and TWOMEY would partner with him in and work to advance the RMSCO beef business.

33.     Later that same evening, July 23, 2015, ILER sent an email to a prospective investor in Food Service Company, in which he recapped his trip to New York City, and noted, in relevant part:

> On my way back from an excellent NYC trip. Parfait is in as soon as we have samples. They are doing an abbreviated test. The coordinator/buyer told me today that Eric really wants the parfait in, quickly….

> NYC couldn't have been more clear about the chicken…Plus Eric has said made [sic] some very clear statements to me that it is our business to lose…So we're in a very, very good spot with what is obviously a key customer. Once we take care of NYC, we will have an intro to the Alliance.

I believe that, here, ILER was telling the prospective investor that GOLDSTEIN had clearly communicated to GOLDSTEIN's SchoolFood staff that he supported Food Service Company's yogurt parfait ("The coordinator/buyer told me today that Eric really wants the parfait in, quickly").   I further believe that GOLDSTEIN had made clear to ILER that GOLDSTEIN would also push for SchoolFood to serve Food Service Company's Chickentopia products ("NYC couldn't have been more clear about the chicken. . . Plus Eric has said made some very clear statements to me that it is our business to lose").   I also believe that ILER was communicating that Food Service Company's success in New York City schools would lead to it obtaining business with other USFA member school districts ("Once we take care of NYC, we will have an intro to the Alliance").

34.     On or about July 28, 2015, ILER, TURLEY and TWOMEY exchanged the following communications:

ILER:         Re legal bills Eric just sent, I thought we were working with
              attorneys that weren't going to charge until we had revenue?

TURLEY:       I'm shaking my head at the legal bills . . .

ILER:          The whole reason to use those guys was because
               they weren't going to charge us right away.   I think
               I remember 1 year.   Tough position for us.   Eric
               was adamant about using these guys.

TWOMEY:   Re legal bills.   Eric says that he will arrange for extended payment
               terms, so I think we're good there.   I think this is his way of
               pushing the beef/egg timeline.

ILER:          Agreed

I believe that, here, GOLDSTEIN had asked ILER, TWOMEY and TURLEY to pay legal fees

that RMSCO had incurred ("Re legal bills Eric just sent, I thought we were working with

attorneys that weren't going to charge until we had revenue?   I'm shaking my head at the legal

bills . . . ").   I am aware that GOLDSTEIN had an established relationship with the referenced

attorneys ("Eric was adamant about using these guys"), and that ILER, TWOMEY and TURLEY

had on multiple occasions questioned what they perceived to be the high cost of the legal fees.   I

further believe that ILER, TURLEY and TWOMEY believed that GOLDSTEIN was using the

outstanding legal fees to induce them to proceed with the RMSCO business on GOLDSTEIN's

terms ("Re legal bills.   Eric says that he will arrange for extended payment terms, so I think

we're good there.   I think this is his way of pushing the beef/egg timeline.   Agreed").

        35.     On or about August 5, 2015, ILER, TWOMEY and TURLEY exchanged

the following communications:

ILER:          Brian can you handle the range start-up stuff? Docs
               to APF, insurance, etc.

               Brian you good to handle RANGE? Obviously Eric
               is pressing hard

TURLEY:    Please

TWOMEY:   No problem

ILER:          Should we consider telling Eric that we submitted

chicken docs?

TURLEY:     Not on this call. He needs to know we're focused on
            this.

Here, I believe that ILER, TURLEY and TWOMEY were strategizing how best to leverage their

relationship with GOLDSTEIN so that GOLDSTEIN would help Food Service Company's

business dealings with SchoolFood and, as part of that strategy, believed that it was in their best

interests for GOLDSTEIN to believe that they (ILER, TURLEY and TWOMEY) were focused

on RMSCO's business, in which GOLDSTEIN had a personal stake.

        36.     On August 19, 2015, ILER sent an email to TURLEY and TWOMEY in

which he recapped a recent conversation with GOLDSTEIN, stating in relevant part:

        [Eric] requested we take down the RANGE logo from our website
        for now. Reason being that we aren't really doing much with it
        now, and he needs to continue being careful. I think it makes
        sense.

I believe this email demonstrates that the Defendants were marketing Range Meats, similar to

Chickentopia and Merrywood Farms, as a brand of Food Service Company ("He requested we

take down the RANGE logo from our website for now").   I also believe that GOLDSTEIN

requested that ILER, TURLEY and TWOMEY remove the RANGE logo to further conceal

RMSCO's connection to Food Service Company from SchoolFood staff ("Reason being that we

aren't really doing much with it now, and he needs to continue being careful").

        37.     Based on my knowledge of the investigation, I am aware that in August

2015, ILER and GOLDSTEIN traveled together to Poland to visit potential beef producers for

the RMSCO business.   In an email dated August 26, 2015 from ILER to TURLEY, TWOMEY,

GOLDSTEIN and Partner No. 5, ILER stated that he and GOLDSTEIN were wrapping up what

they both believed had been a "very successful" trip.   ILER also stated that he hoped to schedule

a meeting in early September in New York City to "fully discuss and document" RMSCO's business plan, including Food Service Company loaning $20,000 to RMSCO to cover purported lawyer fees and "T&E expenses."

       38.    On or about August 26, 2015, while ILER was still in Poland with GOLDSTEIN, ILER exchanged the following communications with TURLEY and TWOMEY:

| | |
|---|---|
| ILER: | Good chat with roger this morning.   All good on the loan plan.   Excited.   Asian invasion was a miscommunication.   Was about a different SKU.   All good on the drummie. Need to limit discussion of range.   Nervous about too many people knowing.   Mentioned he didn't love that wtf is GH knows but no big deal. |
| TURLEY: | Cool. |

Based on my knowledge of the investigation, I am aware that on or about August 24, 2015, GOLDSTEIN, in his position as OSSS Chief Executive, had received a letter from a manufacturer of popular Asian cuisine products sold in retail markets, including schools, (the "Competitor"), in which the Competitor complained that SchoolFood was not being responsive to the Competitor's submission to serve "chicken chunks" in New York City schools.   The Competitor noted that its chicken product was not antibiotic-free and expressed frustration as to why SchoolFood had announced a "fast track" of ABF chicken even though, according to the Competitor, ABF chicken was not consistently available in large volumes.   I believe that GOLDSTEIN had shared this information with ILER while they were traveling together in Poland and that ILER was concerned because the Competitor's complaints might threaten the introduction of Food Service Company's ABF chicken products in schools.   GOLDSTEIN, however, assured ILER that because the Competitor's product was a different product than the Food Service Company's Chickentopia chicken drumsticks, the latter would still be served in schools ("Asian invasion was a miscommunication.   Was about a different SKU.   All good on

the drummie.").   ILER also noted that GOLDSTEIN was "excited" and "all good on the loan plan," which I believe is a reference to the purported $20,000 loan referenced in the prior paragraph.   I further believe that GOLDSTEIN again told ILER that he (GOLDSTEIN) was concerned that too many people were aware of GOLDSTEIN's partnership interest in RMSCO ("Need to limit discussion of range.   Nervous about too many people knowing.   Mentioned he didn't love that wtf is GH[5] knows but no big deal").

39.     A few days later, after ILER and GOLDSTEIN had returned from Poland, ILER and TURLEY traveled to New York City to meet with SchoolFood employees and to meet privately with GOLDSTEIN to discuss RMSCO.   The morning of the meeting with SchoolFood, September 1, 2015, TURLEY sent an email to GOLDSTEIN's NYC DOE email account in which TURLEY wrote, in relevant part:

> I just wanted to give you a quick update on our NAE chicken project with [SchoolFood manager] as I know you (and the Alliance) are very interested in making progress on the anti-biotic free front…
>
> FYI because of the urgency, I am headed for NYC now and my team is meeting with the SchoolFood team later this afternoon. My expectation is that we will be off and running by the time we leave NY. If not, we may require your help/support to overcome additional hurdles to make this happen.

I believe that, here, TURLEY is telling GOLDSTEIN that should Food Service Company face difficulty with SchoolFood employees, TURLEY expected GOLDSTEIN, in his official capacity, to intervene and ensure Food Service Company's chicken products were approved and ultimately distributed to NYC schools ("If not, we may require your help/support to overcome additional hurdles to make this happen").   I am also aware that ILER, TURLEY and TWOMEY

---

[5] I believe "GH" is a reference to a high-ranking executive at Food Service Company, whose identity is known to your affiant and whose initials are G.H.

had plans to have dinner with GOLDSTEIN after their meeting with SchoolFood staff, and to meet privately with GOLDSTEIN the following morning, September 2, 2015, at an office building in downtown Manhattan.   I believe the timing and location of this meeting were meant to conceal that GOLDSTEIN was meeting with a company that had ongoing business before SchoolFood.

40.     On September 1, 2015, a few hours after TURLEY sent the email to GOLDSTEIN referenced in the preceding paragraph, a SchoolFood employee notified TURLEY that the proposed price of Food Service Company's Chickentopia drumsticks was too high. Moments later, TURLEY emailed SchoolFood Executive 2 requesting guidance on how to address the pricing issue.   TURLEY then forwarded both emails to GOLDSTEIN and wrote, in relevant part:

> Hot off the wire from [SchoolFood employee] and my e-mail to [SchoolFood Executive 2]...Appears we have a pricing hurdle…

I believe that, here, TURLEY was leveraging TURLEY's business relationship with GOLDSTEIN to encourage GOLDSTEIN to intervene with SchoolFood employees, including SchoolFood Executive 2, to influence SchoolFood to approve Food Service Company's chicken drumstick at Food Service Company's proposed price.

41.     On September 4, 2015, TURLEY emailed ILER and TWOMEY, stating, in relevant part:

> An "ah-hah"…we talked about the need to change RANGE ownership from our 3 individual LLCs to [Food Service Company] so we can do the loan properly. However, I am concerned about how that this changes the "disclosure" facts for Roger. It does create a concrete connection. Kind of a big deal potentially.

I believe this email demonstrates that TURLEY, ILER and TWOMEY understood that their financial relationship in RMSCO with GOLDSTEIN created a conflict of interest for

GOLDSTEIN.   I further believe that TURLEY, ILER and TWOMEY believed it was in their best interest to structure their financial relationship with GOLDSTEIN in a manner that concealed GOLDSTEIN's financial relationship with them from NYC DOE.

42.     In or about September 2015, SchoolFood conditionally approved Food Service Company's yogurt parfait product to be served in New York City public schools beginning in early 2016 and Food Service Company's chicken drumsticks to be served beginning in mid-January 2016.   Shortly after SchoolFood notified Food Service Company that its chicken drumstick was to be served in January, ILER and TURLEY exchanged the following communications, in relevant part: "tell Eric we may need a 'nudge.'   Don't want to wait until Jan to launch."   I understand this communication to demonstrate that ILER and TURLEY again planned to leverage their financial relationship with GOLDSTEIN to have GOLDSTEIN use his official capacity to intervene with SchoolFood employees to provide a financial benefit for Food Service Company.

43.     On October 2, 2015, a SchoolFood employee informed Food Service Company that the proposed price of its Merrywood Farms yogurt parfait was too high and not acceptable to SchoolFood.   Following this notification, TURLEY emailed several Food Service Company employees, including ILER and TWOMEY, writing, in relevant part: "Roger told Blaine the parfait was done …This may simply be a push the price tactic."   I believe this communication demonstrates that GOLDSTEIN circumvented the contract and bid process and communicated internal SchoolFood information through unofficial channels to assure ILER, TURLEY and TWOMEY that their products would be approved by SchoolFood.

D.      Quid Pro Quo – Goldstein Seeks and Receives Compensation in Exchange for his Support

        44.     On October 12, 2015, TURLEY sent an email to GOLDSTEIN's NYC DOE email account, again noting that Food Service Company and SchoolFood staff could not reach an agreement on certain issues and asking for GOLDSTEIN's assistance.   Specifically, TURLEY told GOLDSTEIN, in relevant part:

> FYI, we have requested a meeting with the SchoolFood team next week.
> 1.  Chicken launch set for January.   We NEED to make sure we are on all menus 2x per month.   With the 'rush' ("we're out of chicken") of this project and then delay until Jan, we have had to re-negotiate with our chicken producer.   As you know it's a tricky proposition when you are doing projections with live animals.   We NEED the volume to make sure we keep our supply.
> 2.  Parfait project has evolved on us too.   We started project with a price target.   Delivered project at target.   Target changed on us.   We have some solutions and are again prepping for a launch.

I believe that, here, TURLEY was again leveraging his financial relationship with GOLDSTEIN to dictate frequency and price of Food Service Company products.   I am aware that GOLDSTEIN immediately forwarded TURLEY's email to SchoolFood Executives 2 and 3 with instructions: "If doable, we should do."   I am aware that GOLDSTEIN's instruction to SchoolFood Executives 2 and 3 ("If doable, we should do") coincided with a wire transfer in the amount of $20,000 from the Food Service Company to the RMSCO bank account on or about October 20, 2015.   At the time of the transfer, the balance in the RMSCO Bank Account was zero.   Two days later, when the funds were in the RMSCO Bank Account, ILER directed that two wire transfers be made from the RMSCO bank account: one in the amount of $12,588.45 to pay RMSCO's legal fees referenced in paragraph 34 above; the second in the amount of $7,000 to GOLDSTEIN's divorce attorney to pay GOLDSTEIN's divorce attorney fees.

45.     The next day, on October 23, 2015, SchoolFood Executive 3 emailed TURLEY and told TURLEY that Food Service Company's yogurt parfait "**if approved**,[6] [] will go to pricing mid December, with a menu date for early spring."   SchoolFood Executive 3 forwarded the email to GOLDSTEIN and told GOLDSTEIN that Food Service Company's "parfait is not ready on their side."   A few days later, however, GOLDSTEIN instructed SchoolFood Executive 3 to "fast track" "Made in NY" products, including Food Service Company's yogurt parfaits, "even if it means a menu change in December or January if product becomes available."

46.     I am aware that ILER, TURLEY and TWOMEY continued to contact GOLDSTEIN and ask for his assistance with resolving disagreements they were having with SchoolFood staff.   For example, on or about December 1, 2015, ILER, TURLEY, TWOMEY and G.H.[7] exchanged the following communications:

| | |
|---|---|
| ILER: | Heads up [SchoolFood Executive 3] is calling |
| G.H.: | What do I need to know? |
| ILER: | Eric is in a tough spot. |
| G.H.: | What's the situation? |
| ILER: | Don't answer yet. |
| TURLEY: | I think we call [SchoolFood Executive 3] on everything we sent to Eric. |
| ILER: | Just wait a minute |
| ILER: | Don't answer yet. |

---

[6] Emphasis in original.

[7] See supra, footnote 5.

Based on my knowledge of the investigation, I am aware that on December 1, 2015,

GOLDSTEIN had again directed SchoolFood staff to place Food Service Company's yogurt

parfait on the menu in December.   Here, I believe that ILER, TURLEY and TWOMEY had

again gone above SchoolFood's senior officials, including SchoolFood Executive 3, and directly

to GOLDSTEIN to ask that GOLDSTEIN intervene ("I think we call [SchoolFood Executive 3]

on everything we sent to Eric") and that as a result GOLDSTEIN "was in a tough spot."   On

December 2, 2015, after issues with the packaging for Food Service Company's yogurt parfait

threatened to delay serving the parfait in schools, SchoolFood Executive 3 emailed SchoolFood

employees and reiterated that "[GOLDSTEIN] has made it clear that we will expedite the parfait

for the Dec menu."

      47.    On December 7, 2015, SchoolFood Executive 3 emailed GOLDSTEIN

about continued pricing issues with Food Service Company's yogurt parfait.   SchoolFood

Executive 3 wrote, in relevant part, "It is not good. They want minimums from the distributors

which we don't do. They are not ready."   GOLDSTEIN responded to SchoolFood Executive 3 a

few minutes later: "I think it is all about pricing and volume.   They need the volume

commitment to get pricing.   We destroy the small guys. Against our strategic interest I would

argue."   I believe these communications demonstrate that SchoolFood employees, including

SchoolFood Executive 3, had advised GOLDSTEIN that Food Service Company was not

prepared ("They are not ready") to supply the yogurt parfait to NYC schools.   I further believe

that GOLDSTEIN's response indicated to SchoolFood Executive 3 and other staff that

GOLDSTEIN supported Food Service Company ("We destroy the small guys.   Against our

strategic interest I would argue").

48.     I am aware that following the introduction of Food Service Company's yogurt parfait and chicken drumstick products in mid-December 2015, ILER, TURLEY and TWOMEY continued to reach out to GOLDSTEIN behind the scenes and asked him to intervene when Food Service Company encountered pushback from SchoolFood employees.   For example, in or about early January 2016, Food Service Company failed to supply the minimum number of chicken drumsticks for service in schools later that month.   In an exchange on or about January 11, 2016, ILER and TURLEY noted that they were concerned that SchoolFood Executive 3 might use the shortages against them:

> TURLEY:     We should be prepared for Eric calling one of us
> about the shortages.   I'm sure [SchoolFood
> Executive 3] will use the opportunity to nail us.
>
> ILER:     3 of us should probably catch up this evening about
> that and other things anyway.
>
> TURLEY:     On the 2% chance he doesn't I refrained from
> giving him a heads up.

49.     On or about January 20, 2016, SchoolFood Executive 3 notified TURLEY and G.H. via email that SchoolFood had, in fact, decided to impose a fine as a penalty for the shortage.   TURLEY forwarded the e-mail to ILER and TWOMEY and stated: "Whoever talks to Roger first, this needs to be addressed."   I understand this communication to demonstrate, again, that TURLEY, ILER and TWOMEY circumvented SchoolFood employees and went directly to GOLDSTEIN and asked that he intervene in Food Service Company's dispute with SchoolFood.

50.     The following day, TURLEY emailed GOLDSTEIN, stating, in relevant part:

> My apologies for bubbling this up to you, but we have been unable
> to resolve with the SchoolFood team and are fearful of where this

> path is leading us. . . .
>
> We respectfully request that you review the facts of this transaction
> and determine what the proper, contractual recourse should be.
> We very much want to avoid having something like this put us
> against the SchoolFood team, the distributors, and NYC.

After the email, TURLEY sent a message to ILER and TWOMEY, "send that ppt to Eric ASAP since I just put a turd in his inbox."   Based on my review of messages that were exchanged a few days later, I believe the PowerPoint presentation ("ppt") that TURLEY referenced was related to RMSCO business.   I understand these communications to demonstrate that TURLEY understood that his request for GOLDSTEIN to intervene on the fines was significant ("I just put a turd in his inbox") and to induce GOLDSTEIN to assist Food Service Company in its dispute with SchoolFood staff, TURLEY asked ILER or TWOMEY to send GOLDSTEIN an update on RMSCO.

51.      On or about January 27, 2016, SchoolFood Executive 3 told TURLEY that SchoolFood had decided to waive imposition of the fine.   In an interview with FBI special agents, a high-ranking SchoolFood official with knowledge of the incident recalled that SchoolFood had intended to impose a fine but that the decision "sort of flipped" following his/her discussions with SchoolFood Executive 2 and GOLDSTEIN, who, according to the high-ranking official, made the final decision.

52.      Beginning in March 2016, ILER, TURLEY and TWOMEY began promoting the Food Service Company's Chickentopia ABF chicken tenders and its Range Meats grass-fed beef burgers to SchoolFood senior officials.   For example, on or about March 30, 2016, TURLEY attended a meeting at SchoolFood's office to promote the Range Meats burger. Following the meeting, TURLEY sent an email to a potential business partner, in which he wrote, in relevant part:

> I think the meeting went very well with [School Executive 3] and
> his team. As well, Eric stopped by to chat with [SchoolFood
> Executive 2] (we met in [SchoolFood Executive 2's] office) and
> grabbed a sample of the burger. He soon returned for seconds and
> brought other folks from his office. I can confidently say they were
> all very happy with this product.

I believe this communication demonstrates that Food Service Company took overt actions to sell the Range Meats burger to SchoolFood and that, in coordination with GOLDSTEIN, ILER, TURLEY and TWOMEY knowingly and purposefully concealed GOLDTEIN's financial interest in the Range Meats burger at the same time GOLDSTEIN endorsed the product ("As well, Eric stopped by to chat [SchoolFood Executive 2] in [SchoolFood Executive 2's] office) and grabbed a sample of the burger.   He soon returned for seconds and brought other folks from his office").

53.     On or about May 10, 2016, ILER, TURLEY and TWOMEY submitted the Range Meats beef burger and Chickentopia chicken tenders for approval.   The approval process for both products was "fast tracked" by SchoolFood executives and both products were ultimately approved by SchoolFood on or about June 20, 2016.

54.     On or about May 13, 2016, three days after the Range Meats burger and Chickentopia chicken tenders were submitted for approval to SchoolFood, ILER made a $10,000 wire transfer from a Food Service Company bank account to the RMSCO Bank Account with the memo "short term loan."   At the time of the transfer, the balance in the RMSCO Bank Account was approximately $361.   Once the funds were in the RMSCO Bank Account, ILER then directed a wire transfer in the amount of $3,000 from the RMSCO Bank Account to a bank account maintained in the name of a close family member of GOLDSTEIN's.

55.     I am further aware that in or about September 2016, SchoolFood began serving Food Service Company's Chickentopia ABF chicken tenders in New York City schools.

However, almost immediately after the tenders were placed on the menu, on or around September 29, 2016, SchoolFood stopped serving them following several complaints from students and school employees that foreign objects, including plastic, had been found in the tenders.

56.     A few weeks later, SchoolFood approved the chicken tenders to again be served in public schools.   On or about October 28, 2016, however, SchoolFood again stopped serving the tenders following additional complaints from students and staff, including one instance where a staff member choked on a chicken bone that had not been removed from a chicken tender.

57.     I am aware that during the next several weeks, ILER, TURLEY and TWOMEY discussed with SchoolFood staff the timing of the reintroduction of the chicken tenders in schools.   While they were having these discussions with SchoolFood, ILER, TURLEY and TWOMEY were also negotiating the transfer of Food Service Company's 60% ownership interest in RMSCO to GOLDSTEIN.   I believe that GOLDSTEIN authorized SchoolFood to serve Food Service Company's chicken tenders in schools only after ILER, TURLEY and TWOMEY agreed to transfer all of Food Service Company's interest in RMSCO to GOLDSTEIN and more than $66,000 to a new RMSCO bank account that GOLDSTEIN had recently opened and that only GOLDSTEIN controlled.

58.     The Defendants began discussing the transfer of the Food Service Company's interest in RMSCO to GOLDSTEIN in or about August 2016 but had not reached an agreement when SchoolFood placed Food Service Company's chicken tenders on hold at the end of October 2016.   For example, on or about September 1, 2016, TURLEY sent the following email to ILER and TWOMEY, in which he wrote, in relevant part:

> I am not in any way in favor of dropping the ball on a [customer]
> we have fostered in the name of [Food Service Company].   I
> assume that you didn't say "transition Lifetime" and he's just
> muscling us.   I have no problem setting him straight.

Based on my knowledge of the investigation, I believe that, here, ILER, TURLEY and

TWOMEY were discussing their negotiations with GOLDSTEIN and their concern that

GOLDSTEIN was attempting to leverage his influence at SchoolFood over Food Service

Company's products to obtain concessions in connection with the transfer of ownership in

RMSCO ("he's just muscling us").

59.     On or about September 26, 2016, TURLEY sent ILER and TWOMEY an

email message, stating, in relevant part:

> From Roger . . . Please let me know when transaction happens and
> need to paper deal.   Can I get a status check on that?   English not
> great.   I assume 'transaction' he is looking for is when checks are
> cut for him and [law firm].   I have no idea what '… and need to
> paper deal' means.

Here, I believe that TURLEY was telling ILER and TWOMEY that GOLDSTEIN wanted to be

issued checks in connection with the transfer of ownership of RMSCO to him ("looking for

when checks are cut for him and [law firm]").

60.     The investigation has revealed that ILER, TURLEY and TWOMEY also

believed that GOLDSTEIN had significant influence, if not the final decision, as to whether

Food Service Company's chicken tenders would be allowed back in schools following the

choking incident on October 28, 2016.   For example, on October 31, 2016, TURLEY and G.H.

met with SchoolFood officials, including SchoolFood Executives 1, 2 and 3 to discuss the

situation.   Prior to the meeting, TURLEY sent an email to GOLDSTEIN in which he wrote, in

relevant part:

> I am sure by now you are aware of the situation regarding our new
> product on your menues, the NAE breaded tender. I am currently

> en route to NYC to meet with [School Executive 3] and the
> SchoolFood team (3:00pm EST).   I don't expect that you would
> be at that meeting, so I wanted to make sure you are aware of the
> most recent important developments.

TURLEY then forwarded the e-mail to ILER, TWOMEY and other Food Service Company

employees and wrote: "Setting expectations, heading off anything that may bubble up, and

hopefully influencing any meeting that happens before we get there…"   GOLDSTEIN

responded to TURLEY a few hours later, in relevant part:

> Of course, we'd prefer to avoid these issues all together and aren't
> seeing them with other chicken providers so the quicker we can
> arrive at an amicable solution the better.

I believe these communications demonstrate that ILER, TURLEY and TWOMEY again

leveraged their financial and business relationship with GOLDSTEIN to encourage

GOLDSTEIN, in his official capacity, to influence SchoolFood staff to the benefit of Food

Service Company ("Setting expectations, heading off anything that may bubble up, and

hopefully influencing any meeting that happens before we get there").   I further believe that

GOLDSTEIN was indicating that he (GOLDSTEIN) would approve Food Service Company's

chicken tenders again being served in schools after the transfer of Food Service Company's

ownership interest in RMSCO to him ("so the quicker we can arrive at an amicable solution the

better").

        61.      Over the next several weeks, ILER, TURLEY and TWOMEY continued

to communicate with GOLDSTEIN about both the reintroduction of Food Service Company's

chicken tenders in schools and the transfer of Food Service Company's 60% interest in RMSCO

to GOLDSTEIN.   For example, on November 7, 2016, TURLEY texted ILER: "Never got

Roger on the phone but had a positive text exchange where he thanked me and said Let's stay

tight and disciplined and communicate.   Thanks again. I think he's all good."

62.     On November 12, 2016, GOLDSTEIN sent the following email to ILER, TURLEY and TWOMEY as part of the continued negotiations regarding the transfer of RMSCO in which he wrote, in relevant part, "suggest putting the figure at an even $65,000 to just keep it clean."   I believe that, here, GOLDSTEIN was demanding, among other things, that ILER, TURLEY and TWOMEY give him $65,000 in addition to transferring Food Service Company's 60% ownership interest in RMSCO to him.

63.     A few days later, on or about November 15, 2016, G.H. sent an email to School Executive 3 requesting that Food Service Company be permitted to substitute its chicken drumsticks (which had not been placed on hold) for chicken tenders on the SchoolFood menu while SchoolFood decided whether to permit the chicken tenders to again be served in schools. SchoolFood Executive 3 forwarded G.H.'s request to SchoolFood Executives 1 and 2 and requested that they let him/her know how to respond to the request.   SchoolFood Executive 2 responded to SchoolFood Executive 3 later that day:

> As per our discussions with Eric yesterday, they should start the
> process of getting their product picked up.   Relative to the ability
> to substitute their drumstick, we were asked to wait a couple days
> before that decision will be made.

I believe that GOLDSTEIN was intentionally delaying deciding whether to allow the chicken drumsticks substitution while he continued to negotiate the transfer of Food Service Company's ownership interest in RMSCO on terms most favorable to him ("we were asked to wait a couple days before that decision will be made").

64.     Later that day, G.H. sent a text message to TWOMEY, ILER and TURLEY in which G.H. noted that he had been advised by SchoolFood Executive 3 that GOLDSTEIN would make the final decisions regarding the chicken drumstick substitution and

whether and when the chicken tenders would be allowed back in New York City schools, and

that the decisions would not be made until that coming Friday at the earliest:

> Traded some text with [SchoolFood Executive 3] tonight.   The
> ball is in Eric and [SchoolFood Executive 2's] hands.   He said he
> is hoping to hear back from [sic] this Friday regarding drum
> substitution and tender launch/next steps.

65.     The following day, on or about November 16, 2016, GOLDSTEIN

emailed TURLEY and TWOMEY to continue to negotiate the terms of their transferring Food

Service Company's 60% ownership interest in RMSCO to him.   GOLDSTEIN noted, among

other things, that GOLDSTEIN thought they "were just about there."   GOLDSTEIN also noted

that the "amount in the document is $65,000.   The legal fees have increased so $75,000 is now

the correct number and in spirit of this agreement and in 'building a moat' as you said to me.…

If you could review and we can wrap up tomorrow or Friday, that would be ideal."

66.     I am aware that for the next couple weeks, GOLDSTEIN, ILER, TURLEY

and TWOMEY continued to negotiate Food Service Company's transfer of its ownership interest

in RMSCO to GOLDSTEIN.   For example, on November 25, 2016, GOLDSTEIN emailed

TURLEY and TWOMEY "Let's get this done and move on."

67.     I am further aware that while he continued to negotiate with ILER,

TURLEY and TWOMEY the transfer of Food Service Company's ownership interest in

RMSCO to him, GOLDSTEIN delayed giving his approval for Food Service Company's chicken

tender products to be served in schools.   For example, on November 28, 2016, G.H. sent an

email to several SchoolFood officials, including SchoolFood Executives 2 and 3, in which he

again asked if Food Service Company could substitute its chicken drumsticks for chicken tenders

while the chicken tender issue was resolved.   G.H. also indicated that Food Service Company

was hoping to reintroduce its chicken tenders in schools on January 30, 2017, and asked SchoolFood to confirm that it intended to approve the chicken tenders being served in schools.

68.     Shortly after SchoolFood received this email, that same day, on November 28, 2016, GOLDSTEIN again emailed TURLEY and TWOMEY and asked them "are we on target[?]"   Later that day, GOLDSTEIN sent an email to TWOMEY and TURLEY in which he attached an agreement transferring Food Service Company's ownership interest in RMSCO to GOLDSTEIN and wrote: "Please execute these documents and send them to me.   I will have [Partner No. 5] execute and will do the same and return to you.   I will also give you RMSCO new checking account details for the close."    I understand these communications to demonstrate that GOLDSTEIN would not approve Food Service Company's chicken tenders again being served in schools until ILER, TURLEY and TWOMEY agreed to transfer Food Service Company's ownership interest in RMSCO to him.

69.     The following day, on or about November 29, 2016, ILER, TURLEY and TWOMEY executed the documents referenced above in paragraph 68 in which, among other things, they agreed to transfer all of Food Service Company's ownership interest in RMSCO to GOLDSTEIN and to also wire approximately $66,670 to the new RMSCO bank account that GOLDSTEIN controlled and that he had opened approximately two weeks earlier.

70.     On or about November 30, 2016, the day after ILER, TURLEY and TWOMEY executed the agreement transferring RMSCO to GOLDSTEIN, SchoolFood Executive 2 forwarded to GOLDSTEIN the November 28, 2016 email referenced above in paragraph 67, and noted:

> [SchoolFood Executive 3] and I have reviewed the attached letter, and are good with serving the drumstix as a substitute while they ramp up inventory, to meet our inventory needs as outlined below. May we proceed?   As we discussed we have not given them an

okay, which we have been holding on doing for two weeks now.
They need an answer today to meet their production deadlines.

I believe that, here, SchoolFood staff, including SchoolFood Executives 2 and 3, had been

waiting two weeks for GOLDSTEIN to approve Food Service Company's requests ("As we

discussed we have not given them an okay, which we have been holding on doing for two weeks

now").   Later that day, GOLDSTEIN approved Food Service Company's request to substitute

its chicken drumsticks for chicken tenders and also authorized SchoolFood to permit Food

Service Company to again serve its chicken tenders in schools beginning in January 2017.

71.     On or about December 8, 2016, pursuant to the terms of the Defendants'

agreement, approximately $66,670 was wired from a Food Service Company bank account to the

new RMSCO bank account that GOLDSTEIN controlled.   In the following weeks,

GOLDSTEIN used the funds to pay $30,000 to a law firm used by RMSCO and almost $10,000

to pay off outstanding divorce attorney fees and credit card debt.   GOLDSTEIN also made

payments to an autobody shop and transferred $10,000 to an individual believed to be the family

member of a business associate of GOLDSTEIN's in Chile.

72.     I am aware that Food Service Company began serving its chicken tender

products in New York City public schools in or about January 2017 until in or about April 2017,

when, following repeated complaints from students and NYC DOE staff of foreign matter,

including plastic, metal and bones, being found in the tenders, SchoolFood decided to remove all

Food Service Company products from New York City public schools.

WHEREFORE, your deponent respectfully requests that arrest warrants issue so

that the defendants ERIC GOLDSTEIN, BLAINE ILER, MICHAEL TURLEY and BRIAN

TWOMEY may be dealt with according to law.

It is further requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and arrest warrants.   I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation and, based upon my training and experience, I have learned that criminals actively search for criminal affidavits and warrants via the internet, and disseminate them to others as they deem appropriate, e.g., by posting them publicly online.   Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Maegan Rees
Special Agent, Federal Bureau of
Investigation

Sworn to before me by telephone this
__27__ day of September 2021

Lois Bloom

THE HONORABLE LOIS M. BLOOM
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No.   21-MJ-1102 |
| | ) | |
| | ) | |
| | ) | |
| Blaine Iler | ) | |

Defendant

## ARREST WARRANT

To:      Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*      Blaine Iler                                                                                         ,

who is accused of an offense or violation based on the following document filed with the court:

❑ Indictment     ❑ Superseding Indictment     ❑ Information     ❑ Superseding Information     ☑ Complaint
❑ Probation Violation Petition     ❑ Supervised Release Violation Petition     ❑ Violation Notice     ❑ Order of the Court

This offense is briefly described as follows:

Violations of Title 18, United States Code, Sections 1951(a) (extortion conspiracy) and 666(a)(2) (bribery relating to programs receiving federal funds)

Date:          09/27/2021                              *Lois Bloom*

                                                                 *Issuing officer's signature*

City and state:      Brooklyn, NY                   The Honorable Lois M. Bloom, U.S. Magistrate Judge

                                                                 *Printed name and title*

| **Return** |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ . |
| Date: _____                    _____ |
|                                                                   *Arresting officer's signature* |
|                                                                   _____ |
|                                                                   *Printed name and title* |

AO 442  (Rev. 11/11)  Arrest Warrant (Page 2)

**This second page contains personal identifiers provided for law-enforcement use only
and therefore should not be filed in court with the executed warrant unless under seal.**

*(Not for Public Disclosure)*

Name of defendant/offender: _____

Known aliases: _____

Last known residence: _____

Prior addresses to which defendant/offender may still have ties: _____

_____

Last known employment: _____

Last known telephone numbers: _____

Place of birth: _____

Date of birth: _____

Social Security number: _____

Height: _____     Weight: _____

Sex: _____     Race: _____

Hair: _____     Eyes: _____

Scars, tattoos, other distinguishing marks: _____

_____

History of violence, weapons, drug use: _____

_____

Known family, friends, and other associates *(name, relation, address, phone number)*: _____

_____

FBI number: _____

Complete description of auto: _____

_____

Investigative agency and address: _____

_____

Name and telephone numbers (office and cell) of pretrial services or probation officer *(if applicable)*: _____

_____

Date of last contact with pretrial services or probation officer *(if applicable)*: _____

_____

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No.   21-MJ-1102 |
| | ) | |
| | ) | |
| | ) | |
| Michael Turley | ) | |

*Defendant*

## ARREST WARRANT

To:      Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*    Michael Turley                                            ,

who is accused of an offense or violation based on the following document filed with the court:

❏ Indictment        ❏ Superseding Indictment        ❏ Information        ❏ Superseding Information        ☑ Complaint

❏ Probation Violation Petition        ❏ Supervised Release Violation Petition        ❏ Violation Notice        ❏ Order of the Court

This offense is briefly described as follows:

Violations of Title 18, United States Code, Sections 1951(a) (extortion conspiracy) and 666(a)(2) (bribery relating to programs receiving federal funds)

Date:        09/27/2021

*Lois Bloom*

*Issuing officer's signature*

City and state:      Brooklyn, NY

The Honorable Lois M. Bloom, U.S. Magistrate Judge

*Printed name and title*

| Return |
|---|

This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____

at *(city and state)* _____ .

Date: _____

_____

*Arresting officer's signature*

_____

*Printed name and title*

AO 442  (Rev. 11/11)  Arrest Warrant (Page 2)

**This second page contains personal identifiers provided for law-enforcement use only
and therefore should not be filed in court with the executed warrant unless under seal.**

*(Not for Public Disclosure)*

Name of defendant/offender: _____

Known aliases: _____

Last known residence: _____

Prior addresses to which defendant/offender may still have ties: _____

_____

Last known employment: _____

Last known telephone numbers: _____

Place of birth: _____

Date of birth: _____

Social Security number: _____

Height: _____   Weight: _____

Sex: _____   Race: _____

Hair: _____   Eyes: _____

Scars, tattoos, other distinguishing marks: _____

_____

History of violence, weapons, drug use: _____

_____

Known family, friends, and other associates *(name, relation, address, phone number)*: _____

_____

FBI number: _____

Complete description of auto: _____

_____

Investigative agency and address: _____

_____

Name and telephone numbers (office and cell) of pretrial services or probation officer *(if applicable)*: _____

_____

Date of last contact with pretrial services or probation officer *(if applicable)*: _____

_____

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No.   21-MJ-1102 |
| | ) | |
| | ) | |
| | ) | |
| Brian Twomey | ) | |

_Defendant_

## ARREST WARRANT

To:      Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

_(name of person to be arrested)_   Brian Twomey                                                                 ,

who is accused of an offense or violation based on the following document filed with the court:

❏ Indictment        ❏ Superseding Indictment        ❏ Information        ❏ Superseding Information        ☑ Complaint

❏ Probation Violation Petition        ❏ Supervised Release Violation Petition        ❏ Violation Notice        ❏ Order of the Court

This offense is briefly described as follows:

Violations of Title 18, United States Code, Sections 1951(a) (extortion conspiracy) and 666(a)(2) (bribery relating to programs receiving federal funds)

Date:      09/27/2021                                  _Lois Bloom_

_Issuing officer's signature_

City and state:      Brooklyn, NY                          The Honorable Lois M. Bloom, U.S. Magistrate Judge

_Printed name and title_

| Return |
|---|
| This warrant was received on _(date)_ _____ , and the person was arrested on _(date)_ _____ at _(city and state)_ _____ . |
| Date: _____                    _____ |
| _Arresting officer's signature_ |
| _____ |
| _Printed name and title_ |

AO 442  (Rev. 11/11)  Arrest Warrant (Page 2)

**This second page contains personal identifiers provided for law-enforcement use only
and therefore should not be filed in court with the executed warrant unless under seal.**

*(Not for Public Disclosure)*

Name of defendant/offender: _____

Known aliases: _____

Last known residence: _____

Prior addresses to which defendant/offender may still have ties: _____

_____

Last known employment: _____

Last known telephone numbers: _____

Place of birth: _____

Date of birth: _____

Social Security number: _____

Height: _____     Weight: _____

Sex: _____     Race: _____

Hair: _____     Eyes: _____

Scars, tattoos, other distinguishing marks: _____

_____

History of violence, weapons, drug use: _____

Known family, friends, and other associates *(name, relation, address, phone number)*: _____

FBI number: _____

Complete description of auto: _____

Investigative agency and address: _____

Name and telephone numbers (office and cell) of pretrial services or probation officer *(if applicable)*: _____

Date of last contact with pretrial services or probation officer *(if applicable)*: _____

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No.   21-MJ-1102 |
| | ) | |
| | ) | |
| Eric Goldstein | ) | |
| *Defendant* | ) | |

## ARREST WARRANT

To:      Any authorized law enforcement officer

   **YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*   Eric Goldstein                                                     ,

who is accused of an offense or violation based on the following document filed with the court:

❑ Indictment     ❑ Superseding Indictment     ❑ Information     ❑ Superseding Information     ☑ Complaint
❑ Probation Violation Petition     ❑ Supervised Release Violation Petition     ❑ Violation Notice     ❑ Order of the Court

This offense is briefly described as follows:

   Violations of Title 18, United States Code, Sections 1951(a) (extortion conspiracy) and 666(a)(1)(B) (bribery relating to programs receiving federal funds)

Date:       09/27/2021

*Lois Bloom*
*Issuing officer's signature*

City and state:      Brooklyn, NY

The Honorable Lois M. Bloom, U.S. Magistrate Judge
*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ . |
| Date: _____ |
| _____ |
| *Arresting officer's signature* |
| _____ |
| *Printed name and title* |

AO 442  (Rev. 11/11)  Arrest Warrant (Page 2)

**This second page contains personal identifiers provided for law-enforcement use only
and therefore should not be filed in court with the executed warrant unless under seal.**

*(Not for Public Disclosure)*

Name of defendant/offender: _____

Known aliases: _____

Last known residence: _____

Prior addresses to which defendant/offender may still have ties: _____

_____

Last known employment: _____

Last known telephone numbers: _____

Place of birth: _____

Date of birth: _____

Social Security number: _____

Height: _____  Weight: _____

Sex: _____  Race: _____

Hair: _____  Eyes: _____

Scars, tattoos, other distinguishing marks: _____

_____

History of violence, weapons, drug use: _____

_____

Known family, friends, and other associates *(name, relation, address, phone number)*: _____

_____

FBI number: _____

Complete description of auto: _____

_____

Investigative agency and address: _____

_____

Name and telephone numbers (office and cell) of pretrial services or probation officer *(if applicable)*: _____

_____

Date of last contact with pretrial services or probation officer *(if applicable)*: _____

_____